**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal Action No. 22-11-MN-1 |
| OLUGBENGA LAWAL, | ) | |
| also known as "Razak Aolugbengela," | ) | |
| | ) | |
| Defendant. | ) | |

## <u>GOVERNMENT'S SENTENCING MEMORANDUM</u>

Defendant Olugbenga Lawal worked directly with the leader of an international criminal organization engaged in fraud and money laundering to personally launder millions of dollars in illicitly obtained funds. He repeatedly opened bank accounts to keep the money laundering operation running and engaged in sophisticated import/export and currency exchange business transactions to facilitate the repatriation of the organization's fraud proceeds back to Nigeria. Lawal's actions helped victimize numerous individuals and entities.

The United States Probation Office has calculated Lawal's advisory guidelines range as 121-151 months, and the government agrees that the Presentence Investigation Report's calculation is accurate. (*See* D.I. 209 (Amended Presentence Investigation Report dated Dec. 19, 2023 ("PSR")) ¶ 92.) The government submits that consideration of the facts of this case and the § 3553(a) factors demonstrates that a 121-month term of imprisonment is sufficient but not greater than necessary to comply with the goals of sentencing. For those reasons and the reasons set forth below, the government respectfully recommends that the Court sentence Lawal to a 121-month sentence.[1]

---

[1] As is standard practice in this District, the government is attaching a sealed Attachment A to this Sentencing Memorandum.

## I.    Background

1.    <u>Procedural History</u>

On February 1, 2022, a federal Grand Jury returned a one-count indictment charging Lawal, along with Michael Hermann, Rita Assane, and Dwight Baines, with conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).   PSR ¶ 1.   Lawal proceeded to trial on the indictment on August 7, 2023.   PSR ¶ 6.   Following a four-day trial, the jury returned a guilty verdict.   PSR ¶ 7.   Sentencing in this matter is currently set for January 8, 2024.

2.    <u>Factual Background</u>[2]

For over a year, Lawal was an active member of a Nigerian-based criminal organization led by C.B.   That organization engaged in sophisticated internet-based frauds, such as romance fraud and business email compromises ("BECs"), and defrauded individuals and businesses out of millions of dollars.   Lawal worked in lock-step with C.B.—the two were in direct communication—to receive fraudulently obtained money into his bank accounts.   Lawal then used various money laundering techniques to help convert the fraud dollars deposited into his bank accounts into Nigerian currency accessible to other members of the organization in Nigeria.

Between January 2019 and May 2020, over $3.6 million flowed through bank accounts Lawal used to launder fraud proceeds.   Those deposits were spread across 7 different bank accounts Lawal opened in his own name or the name of his business entity, Luxe Logistics LLC. In fact, between May 2019 and July 2020, Lawal opened at least 9 different bank accounts in his own name or the name of Luxe Logistics.   Ultimately, Lawal controlled bank accounts at no less than five different financial institutions in furtherance of his money laundering.

Lawal served as both a first-level and second-level (and at times third-level) money

---

[2] The facts in this section derive from the PSR and the evidence presented at trial.

launderer for C.B.    That is, he received fraud proceeds directly from both victims and other money launderers working for C.B.    Romance fraud victims were directed by their online relationships to (i) wire money to Lawal-controlled bank accounts, (ii) mail Lawal checks addressed to himself or his entity, and (iii) deposit checks and cash directly into Lawal-controlled bank accounts. Other money launderers working for C.B. were similarly instructed to send a portion of victim money *they* received on to Lawal, frequently via cashier's check or money order sent to one of Lawal's addresses.

For example, Lawal received hundreds of thousands of dollars from co-Defendants Hermann, Assane, and Baines, who operated a money-laundering crew out of South Florida for C.B.'s criminal organization.    C.B. provided specific instructions to Hermann—who passed those instructions on to Assane and Baines—to send hundreds of thousands of dollars of victim money straight to Lawal.    C.B. explained to Hermann that Lawal received that money because Lawal was his (i.e. C.B.'s) "partner" in the romance fraud operation and that the money they were sending was "Lawal's money."    Lawal, moreover, received money from numerous other individuals and entities who—like Hermann, Assane, and Baines—received fraud money for C.B.'s organization and who later forwarded portions of that fraud money to Lawal.

Lawal played a vital role for the criminal organization by working to convert the fraud dollars entering his accounts into Nigerian currency accessible in Nigeria.    Lawal performed that role in two primary ways.    First, Lawal spent over a million dollars between 2019 and 2020 at car auctions and car dealerships.    Those cars were bought with fraud dollars and many of them were then shipped to Nigeria to be sold as a means to get the criminal organization's ill-gotten gains back to Nigeria in a usable, and "clean," form.    Second, Lawal entered into currency exchange relationships with other members of the Nigerian community in Indianapolis engaged in exporting

cars to Nigeria.   For example, the general business model of such car exporters was buying cars in America for export to customers in Nigeria.   Those customers would pay in Nigerian currency, but the car exporters had to buy the cars with United States Dollars.   Therefore, members of the community would swap Nigerian currency (in Nigerian bank accounts) for United States Dollars (in American bank accounts).   Lawal was a source of dollars for dollar-needy exporters, but the dollars he provided were victim dollars he obtained as a money launderer for the criminal organization.   In return for those fraud dollars, Lawal received Nigerian currency into his Nigerian bank accounts.

Lawal, moreover, benefited substantially from laundering money for C.B.'s organization. Lawal withdrew over $500,000 in cash in 2019 and 2020 from the accounts he used as part of his money laundering activities.

## II.    This Court Should Overrule Lawal's Objections to the PSR[3]

Lawal has raised numerous objections to the PSR.   This Court should reject them all.

*Factual Objections*. Lawal objects to nearly all the conduct attributed to him in the PSR on the basis that he maintains his innocence.   The jury, however, determined that Lawal was a knowing member of C.B.'s fraud and money laundering organization and that he knowingly joined with others to transact in fraud proceeds and conceal fraud proceeds.   As specifically detailed in the government's response to Lawal's Motion for Judgment of Acquittal or for a New Trial (*see* D.I. 186), the trial evidence fully supported the jury's verdict and the conduct attributed to Lawal in the PSR.

---

[3] In responding to Lawal's PSR objections, the government cites to—and relies on—trial exhibits and trial testimony already in the record.   Attached to this Sentencing Memorandum is an Appendix containing excerpts of those portions of the trial record cited herein.

*Value of Laundered Funds Objections.* Lawal objects to the PSR's calculation of the value of funds he laundered as part of his involvement in the money laundering conspiracy. Lawal does not object to the $1,460,875 restitution figure, but rather contends the value of funds laundered should be limited to that restitution figure. *See* PSR p. 23 (describing Lawal's objection). Lawal, however, wrongly uses restitution as a proxy for the total value of funds laundered by Lawal. The restitution figure is limited to the amount of money the government could identify was lost by identifiable victims. As Lawal was a second- and third-level money launderer for C.B., the government could not always trace the illicit proceeds entering his accounts to the underlying victim. The value of funds Lawal is held responsible for laundering under § 2S1.1(a)(2) is therefore not limited to the $1,460,875 restitution figure. It is increased by deposits the government's evidence linked to fraud but not to a victim and by all commingled funds for which Lawal cannot demonstrate a legitimate source.

First, the government's evidence at trial identified an additional $435,400.00 of illicit proceeds deposited into Lawal's accounts that could not be traced to an underlying victim, but was traced to an individual or entity associated with C.B.'s criminal organization:

| Bank Account | Check Amount | Remitter | Date | Government Trial Exhibit |
|---|---|---|---|---|
| BOA 1482 | $23,500 | Residential General Services | 5/31/2019 | GX213 p. 1 |
| BOA 1482 | $21,900 | Residential General Services | 6/5/2019 | GX213 p. 2 |
| BOA 1482 | $10,000 | Residential General Services | 6/18/2019 | GX213 p. 5 |
| BOA 1482 | $9,500 | Thomas Kelvin | 6/21/2019 | GX213 p. 6 |
| BOA 1482 | $40,500 | Thomas Kelvin | 8/6/2019 | GX213 p. 14 |
| BOA 1482 | $5,000 | The Mullings Group LLC | 8/7/2019 | GX213 p. 15 |
| BOA 1482 | $2,500 | Malachi Mullings | 8/7/2019 | GX213 p. 15 |
| BOA 1482 | $28,000 | Thomas Kelvin | 8/21/2019 | GX213 p. 19 |
| JPMC 1209 | $26,000 | The Mullings Group LLC | 10/15/2019 | GX211 p. 15 |
| JPMC 1209 | $4,500 | Malachi Mullings | 10/17/2019 | GX211 p. 15 |
| JPMC 1209 | $16,800 | Residential General Services | 5/30/2019 | GX211 p. 2 |
| JPMC 5528 | $30,000 | Residential General Services | 4/29/2019 | GX210 p. 29 |
| JPMC 5528 | $7,600 | The Mullings Group LLC | 4/29/2019 | GX210 p. 29 |
| JPMC 5528 | $6,450 | Malachi Mullings | 4/30/2019 | GX210 p. 30 |

5

| JPMC 5528 | $5,550 | Malachi Mullings | 4/30/2019 | GX210 p. 30 |
| JPMC 5528 | $19,800 | Residential General Services | 5/17/2019 | GX210 p. 41 |
| JPMC 5528 | $19,800 | Residential General Services | 5/21/2019 | GX210 p. 44 |
| JPMC 5528 | $50,000 | Residential General Services | 5/30/2019 | GX210 p. 48 |
| JPMC 5528 | $49,500 | Residential General Services | 6/11/2019 | GX210 p. 54 |
| JPMC 5528 | $18,500 | Thomas Kelvin | 9/9/2019 | GX210 p. 78 |
| JPMC 5528 | $40,000 | The Mullings Group LLC | 10/24/2019 | GX210 p. 93 |

Hermann, for example, testified how Mullings and The Mullings Group LLC were connected to C.B.   Trial Tr. Vol. 2 pp. 272-74.   The stipulated testimony of romance victim S.M., moreover, showed that her online relationship instructed her to send money to The Mullings Group LLC.   Trial Tr. Vol. 2 pp. 244-45.   Additionally, the stipulated testimony of romance fraud victim D.C. showed that her online relationship instructed her to send money to "Residential Gen. Services" and "Thomas Kelvin," as well as money straight to Lawal.   Trial Tr. Vol. 1 pp. 229-31. The evidence therefore supports that the money Lawal received from Mullings, The Mullings Group LLC, Thomas Kelvin, and Residential General Services was all fraud money he was laundering for C.B.   That $435,400, plus the undisputed restitution figure of $1,460,875, results in $1,896,275 of unquestionably laundered funds.

Second, the evidence the government introduced at trial demonstrates, by a preponderance of the evidence, that all the money flowing through Lawal's bank accounts involved money laundering activity—not just the nearly $2 million described above.  That was shown through Lawal's pattern of repeatedly opening bank accounts after earlier accounts were shut down, the pattern of financial activity occurring within his bank accounts, and his failure to report any of the over $3.6 million entering his accounts to the Internal Revenue Service ("IRS") as business revenue or income.

Lawal, for example, opened at least 9 different bank accounts in his name or the name Luxe Logistics LLC between May 2019 and July 2020.   *See* GX200.   He opened those accounts after

6

a pre-existing account he had opened years earlier—his JPMC account ending in 5528—began receiving deposits linked to fraud in early 2019. *See, e.g.*, GX212 p. 2. Each of the 9 new accounts he opened closed within 6 months. *See* GX200. Yet Lawal continued to open account after account.

Trial testimony demonstrated how the pattern of activity throughout all of Lawal's accounts was consistent with money laundering. Thomas Trusty, a JP Morgan Chase fraud investigator, testified how his review of Lawal's JP Morgan Chase banking activity showed no "legitimate business activity" and that it appeared, based in his experience, "to involve money laundering." Trial Tr. Vol. 2 p. 394. FBI Special Agent Katherine Martinez likewise testified about the pattern of financial activity she observed when reviewing Lawal's bank records. She identified, for example, checks deposited into Lawal's accounts containing memo lines with descriptions disconnected from any activity Lawal was known to engage in. Trial Tr. Vol. 3 pp. 743-44 (discussing $100,000 check with memo line "Andrew-Legal"); p. 760 (discussing $27,000 check with memo line "house remodeling"). SA Martinez found it unusual that the over million dollars coming into Lawal's personal accounts did not come from "a steady incoming source of salary" but rather from "really large dollar amount transactions from a lot of different business entities and individuals from all over the country." Trial Tr. Vol. 3 pp. 744-45. SA Martinez also testified she could not recognize any identifiable connection between the large incoming deposits and subsequent purchases and withdrawals made with the deposited funds. Trial Tr. Vol. 3 p. 745. SA Martinez discussed how her review of Lawal's bank accounts identified "large round dollar amount cashier check" deposits, the funds of which "were rapidly withdrawn from the account within a few days." Trial Tr. Vol. 3 p. 751. SA Martinez testified such activity was consistent across Lawal's different accounts. *See, e.g.*, Trial Tr. Vol. 3 pp. 744-45 (discussing

7

JPMC accounts), 751 (discussing Bank of America accounts), 760 (discussing Huntington National Bank accounts), 763-64 (discussing PNC Bank accounts). Expert testimony from FBI Special Agent Edgar W. Koby, Jr. described how the receipt of large round dollar deposits, followed by rapid withdrawal of funds, was a pattern of financial activity he associated with money laundering. Trial Tr. Vol. 1 pp 154-55.

SA Martinez also discussed the income Lawal chose to disclose to the IRS in tax years 2019 and 2020. In 2019, Lawal did not disclose any income to the IRS despite controlling bank accounts receiving over $2 million in deposits. Trial Tr. Vol. 3 pp. 708-09. In 2020, Lawal disclosed only $15,817 in wage income to the IRS despite controlling Luxe Logistics LLC business accounts receiving over $580,000 in 2020. Trial Tr. Vol. 3 pp. 709-12. Lawal did not disclose to the IRS in 2020 any profit, loss, sales, or income connected to his association with Luxe Logistics LLC. Trial Tr. Vol. 3 pp. 713-14. The government submits that such evidence and testimony, already in the record, establishes by a preponderance of the evidence that the total sum of money flowing through Lawal's accounts—over $3.6 million—involved money laundering.

Last, even if the Court were not convinced by the above, commentary to § 2S1.1 explains how a court should approach calculating the value of laundered funds when criminally derived funds are comingled with alleged legitimately derived funds. Application Note 3(B) explains that in the case of comingled funds:

> the value of the laundered funds, for purposes of subsection (a)(2), is the amount of the criminally derived funds, not the total amount of the commingled funds, if the defendant provides sufficient information to determine the amount of criminally derived funds without unduly complicating or prolonging the sentencing process. If the amount of the criminally derived funds is difficult or impracticable to determine, the value of the laundered funds, for purposes of subsection (a)(2), is the total amount of the commingled funds.

U.S.S.G. § 2S1.1 cmt. n.3(B).

Here, Lawal has provided no information that any funds were legitimate, let alone information that would allow the Court to identify "the amount of criminally derived funds without unduly complicating or prolonging the sentencing process." As such, "the value of the laundered funds . . . is the total amount of the commingled funds." Here, that is over $3.6 million.

***Vulnerable Victim Objection.*** Lawal objects to § 3A1.1(b)(1)'s vulnerable victim enhancement primarily based on the contention that "there was no evidence presented that Mr. Lawal was aware of who the victims were or what schemes were producing the money that he received." As summarized below, the government submits that testimony and evidence introduced at trial demonstrated by a preponderance of the evidence that Lawal and C.B. purposefully targeted older Americans on dating websites.

The enhancement applies if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). The enhancement is appropriate if the evidence demonstrates that (1) "the victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner[.]" *United States v. Zats*, 298 F.3d 182, 186 (3d Cir. 2002). Although Lawal contests only the second factor, all three factors are satisfied.

First, at least some victims of this criminal conspiracy were particularly vulnerable. This Court heard testimony from numerous older Americans who were widowed or otherwise looking for companionship on the internet. *See, e.g.*, Trial Tr. Vol. 1 pp. 169-70 (testimony of V.P.); Trial Tr. Vol. 2 pp. 239-40 (stipulated testimony of S.M.); Trial Tr. Vol. 3 pp. 581-83 (testimony of B.P.). These were individuals largely in their 60s and 70s at the time of the offense. Some of those victims were suffering in the aftermath of the death of a spouse or the end of a decades-long

marriage.   And C.B.'s organization specifically looked for older victims by setting up fake dating profiles on websites, such as SilverSingles.com, targeted towards that demographic.   *See, e.g.*, Trial Tr. Vol. 2 p. 349 (testimony of R.L. describing meeting his online relationship on the website Silver Singles and describing the website as targeting older people); p. 399 (testimony of F.A. describing the same).   As the victims at trial testified, they were fed lies to induce the victims to fall in love, and then manipulated into giving their "lovers" more and more money.   As the United States Court of Appeals for the Seventh Circuit said when upholding the enhancement in analogous circumstances, "Age, lack of sophistication, and personal loss . . . on the part of the victims, coupled with the defendant's skillful employment of electronic media, rendered her targets helpless—proof they were unusually vulnerable."   *United States v. Iriri*, 825 F.3d 351, 353 (7th Cir. 2016).

Second, evidence at trial demonstrated that Lawal knew or should have known that C.B. targeted older Americans looking for companionship.   Hermann, for example, testified that C.B. described Lawal as his "partner . . . [i]n the romance fraud thing they had going on."   Trial Tr. Vol. 2 p. 307.   Assane likewise testified that C.B. said that the people he was instructing Hermann to send money, including Lawal, were "associated with the fraud victim."   Trial Tr. Vol. 3. p. 676. Hermann, moreover, testified how C.B. told him how the whole idea behind the romance fraud his organization perpetrated was to "find older people that have money and get them out of their money, trick them out of their money[.]"   Trial Tr. Vol. 2 p. 295.

Third, the vulnerability of the victims not only facilitated the underlying fraud that gave rise to the illicit proceeds, but it also facilitated the money laundering conspiracy.   For example, Hermann explained how C.B. used the victims' vulnerability to convince people like him to launder money for the organization.   Hermann testified that C.B. told him "the people that he

10

works with have these people under control" and that there was little risk that the victims would ever try to get their money back because the victims believed they were sending money to people they had fallen in love with. *See* Trial Tr. Vol. 2 p. 294-95. Since the victims were not immediately reporting "stolen" money to their banks, the money launderers, such as Lawal and Hermann, were able to quickly remove and/or transfer the illicit proceeds out of their accounts to further the organization's money laundering efforts.

Lawal further objected to this enhancement on the basis that there was "testimony from business owners who were defrauded." But the enhancement does not require that all victims of the offense be considered vulnerable; only that the defendant knew "a victim" of the offense was a vulnerable victim. It is therefore of no consequence that some victims were business owners or otherwise not vulnerable victims.

### III.    A 121-Month Sentence Is Sufficient But Not Greater Than Necessary To Comply With the 18 U.S.C. § 3553(a) Factors

In sentencing Lawal, the Court must consider the statutory factors set forth in 18 U.S.C. § 3553(a). Those factors include the nature and circumstances of the offense; Lawal's history and characteristics; and the need to deter Lawal and others from contemplating similar crimes in the future. Consideration of the § 3553(a) factors in this case demonstrates that a 121-month sentence is sufficient but not greater than necessary to comply with the statutory sentencing factors.

The nature and circumstances of Lawal's conduct in this case are serious and warrant a guidelines term of imprisonment. Lawal was not a fly-by member of C.B.'s criminal organization. He continuously received, laundered, and benefited from fraudulently obtained money for over a year. And the evidence reflects that Lawal was a more senior member of C.B.'s organization than any of his co-defendants. As Hermann explained at trial, Lawal was C.B.'s "partner" in the romance fraud operation. And the evidence backed that up. WhatsApp

11

messages and testimony reflected that Lawal was in direct communication with C.B. to provide instructions for how Lawal was to receive the fraud proceeds. Lawal, moreover, was higher-up the money laundering chain. C.B. continuously instructed Hermann to pass victim money up to Lawal; neither Hermann, Assane, nor Baines ever received money from Lawal. So, although the evidence did not reveal that Lawal was directly leading, supervising, or managing other individuals—and thus not eligible for a role adjustment under U.S.S.G. § 3B1.1—his senior role within C.B.'s organization was clear and warrants a guidelines term of imprisonment.

Lawal's conduct in this case, moreover, was extensive and persistent. He repeatedly opened bank accounts to continue laundering money as earlier bank accounts got closed for fraud. And in the face of direct warnings from bank fraud investigators that his accounts were receiving fraudulent proceeds, Lawal simply continued on and evolved his methods. For example, to legitimize his money laundering efforts, he registered Luxe Logistics LLC and began to open bank accounts in the name of that business entity to evade suspicion. And Lawal did all this knowing he was laundering money from romance fraud. Lawal played an integral role in the financial ruin of numerous victims and his term of imprisonment should reflect that reality.

Lawal's personal history and characteristics likewise support a sentence within the guidelines range. Lawal's employment record, for example, supports that the more than $3.6 million flowing through his accounts were wholly tied to illegitimate activity. His purported "modest" success in buying and selling cars does not explain that amount of money, and the evidence demonstrated that his operation of Luxe Logistics LLC was nothing more than a means to further his money laundering activities. That is supported by the fact that Lawal did not report any of the $3.6 million flowing through his accounts to the IRS as business revenue or business income. Lawal, therefore, seems to have been supporting himself at the relevant time through the

money he earned by laundering money, not by engaging in any type of legitimate business activity.

A guidelines term of imprisonment is also necessary to deter both Lawal and others from engaging in similar criminal conduct.    Lawal remains unrepentant and believes he did nothing wrong.    If the mountain of evidence presented at trial and the jury's guilty verdict have not caused Lawal to reflect on his conduct, this Court's sentence must.    Lawal will view any break afforded him as a license to return to criminality at the earliest opportunity.

As discussed above, moreover, Lawal and his co-conspirators played an essential role for the larger criminal conspiracy.    Internet frauds such as romance fraud and BECs are frequently perpetrated on American victims by criminal organizations based overseas.    To legitimize the underlying frauds, evade bank investigators' prying eyes, and conceal the path of the fraudulent funds, such criminal organizations require money launderers in the United States to serve as first- and second-level recipients of the fraudulently obtained proceeds.    And as evidenced by this case, too many people sign up for those roles as a way to make easy money.

And these internet-based frauds continue to divert ever increasing amounts of money from innocent Americans and American businesses into the hands of criminals.    Every year between 2019 and 2022, the FBI has identified over 40,000 individuals or entities victimized by romance fraud or BECs.[4]    Romance fraud resulted in the loss of over $475 million in 2019, over $600 million in 2020, over $950 million in 2021, and over $735 million in 2022.    BECs resulted in the

---

[4] *See* Federal Bureau of Internet Crime Complaint Center, *2022 Internet Crime Report*, p. 23; https://www.ic3.gov/Media/PDF/AnnualReport/2022_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2021 Internet Crime Report*, p. 22, https://www.ic3.gov/Media/PDF/AnnualReport/2021_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2020 Internet Crime Report*, p. 19, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2019 Internet Crime Report*, p. 19, https://www.ic3.gov/Media/PDF/AnnualReport/2019_IC3Report.pdf.

loss of over $1.7 billion in 2019, over $1.8 billion in 2020, over $2.3 billion in 2021, and over $2.7 billion in 2022.[5]   Imposing a guidelines sentence would send the important message that helping to facilitate internet-based fraud is not an "easy" way to make money and that those who nonetheless decide to engage in such conduct will face the serious consequences merited by their actions.

### IV.    Restitution and Personal Money Judgment

The government agrees that the individuals and entities identified in Paragraph 105 of the PSR are owed restitution in the amounts listed and that Lawal should be jointly and severally liable for that restitution order along with co-Defendants Hermann, Assane, and Baines.    The government understands that additional victim-related information may be received by the United States Probation Office prior to sentencing and the government reserves the right to revise its restitution recommendation based on any future revisions or additions to the PSR.

Moreover, pursuant to this Court's Preliminary Order of Forfeiture, Lawal's sentence should include a personal money judgment in the amount of $3,600,000.

---

[5] *See* Federal Bureau of Internet Crime Complaint Center, *2022 Internet Crime Report*, p. 22; https://www.ic3.gov/Media/PDF/AnnualReport/2022_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2021 Internet Crime Report*, p. 23, https://www.ic3.gov/Media/PDF/AnnualReport/2021_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2020 Internet Crime Report*, p. 20, https://www.ic3.gov/Media/PDF/AnnualReport/2020_IC3Report.pdf;
Federal Bureau of Internet Crime Complaint Center, *2019 Internet Crime Report*, p. 20, https://www.ic3.gov/Media/PDF/AnnualReport/2019_IC3Report.pdf.

V.      **Conclusion**

For the foregoing reasons, the government respectfully requests that the Court sentence Lawal to a 121-month term of imprisonment, restitution as set forth in Paragraph 105 of the PSR, and a personal money judgment for $3,600,000.

<div style="margin-left:50%">

Respectfully submitted,

DAVID C. WEISS
UNITED STATES ATTORNEY

*/s/ Jesse S. Wenger*

By:   Jesse S. Wenger
      Assistant United States Attorney

</div>

Dated: December 29, 2023